# **EXHIBIT D**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| WOODBRIDGE GROUP OF COMPANIES LLC, *et al.*,[1] | Case No. 17-12560 (KJC) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. 2397** |

### DECLARATION OF BRADLEY D. SHARP IN SUPPORT OF CONFIRMATION OF THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION OF WOODBRIDGE GROUP OF COMPANIES, LLC AND ITS AFFILIATED DEBTORS

I, Bradley D. Sharp, hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

1. I am President and CEO of Development Specialists, Inc. ("DSI"), located at 333 S. Grand Avenue Suite 4070, Los Angeles, California 90071, and the Chief Restructuring Officer ("CRO") of WGC Independent Manager LLC, a Delaware limited liability company ("WGC Independent Manager"), which is the sole manager of debtor Woodbridge Group of Companies, LLC, a Delaware limited liability company and an affiliate of each of the debtors and debtors in possession (each, a "Debtor" and collectively, the "Debtors") in the above-captioned jointly administered chapter 11 cases (the "Chapter 11 Cases"). I am also Chief Restructuring Officer of each of the Debtors. I submit this Declaration in support of (i) confirmation of the *First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors* [Docket No. 2397] (as amended,

---

[1] The last four digits of Woodbridge Group of Companies, LLC's federal tax identification number are 3603. The mailing address for Woodbridge Group of Companies, LLC is 14140 Ventura Boulevard #302, Sherman Oaks, California 91423. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors, the last four digits of their federal tax identification numbers, and their addresses are not provided herein. A complete list of such information may be obtained on the website of the Debtors' noticing and claims agent at www.gardencitygroup.com/cases/WGC.

01:23758481.2

supplemented, or modified from time to time pursuant to the terms thereof, the "Plan"[2]) proposed by the Debtors, and (ii) the *Debtors' Motion for Approval of Certain Compromises and Settlements, Partial Substantive Consolidation, and Related Relief with Respect to the Plan* [Docket No. 2721] (the "Plan Settlements Motion").

2.  On February 13, 2018, the Court entered an order authorizing the Debtors to retain and employ DSI as their restructuring advisor and to designate me as CRO, *nunc pro tunc* to January 26, 2018. In such capacity, I am familiar with the day-to-day operations and financial affairs of the Debtors. I am one of the individuals responsible for devising and implementing the Debtors' wind-down and liquidation strategies and overseeing the Debtors' financial and operational affairs. I have been consistently involved in or am familiar with the Debtors' wind-down activities and development of the Plan. I have reviewed and am familiar with the terms and provisions of the Plan.

3.  Except as otherwise indicated, all facts set forth in this Declaration are based on: (a) my direct personal knowledge of the Debtors' assets, operations, and finances; (b) information learned from my review of relevant documents; and/or (c) opinion based on experience and knowledge of the Debtors' business affairs and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

## I. GENERAL BACKGROUND

4.  On December 4, 2017, a total of 279 Debtors commenced voluntary cases under chapter 11 of the Bankruptcy Code. Thereafter, on February 9, 2018, March 9, 2018, March 23, 2018, and March 27, 2018, additional affiliated Debtors (27 in total) commenced voluntary cases under chapter 11 of the Bankruptcy Code. Pursuant to sections 1107(a) and 1108 of the

---

[2] Capitalized terms used but not otherwise defined in this Declaration have the meanings ascribed to those terms in the Plan.

Bankruptcy Code, the Debtors are continuing to manage their financial affairs as debtors in possession.

5.      The Chapter 11 Cases are being jointly administered pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.  No trustee has been appointed in the Chapter 11 Cases.  An official committee of unsecured creditors (the "Unsecured Creditors' Committee") was appointed on December 14, 2017 [Docket No. 79].  On January 23, 2018, the Court approved a settlement providing for the formation of an official ad hoc noteholder group (the "Noteholder Committee") and an official ad hoc unitholder group (the "Unitholder Committee" and with the Noteholder Committee and the Unsecured Creditors' Committee, the "Committees"), as well as a replacement board (the "New Board") and management for the Debtors [Docket No. 357].

## II.  BACKGROUND REGARDING THE PLAN PROCESS

6.      Immediately following the appointment of the New Board, the Debtors focused on bringing the Chapter 11 Cases to a rapid consensual resolution, so as to return as much money as possible, as promptly as possible, to creditors.

7.      To that end, the Debtors' counsel at Klee, Tuchin, Bogdanoff & Stern LLP ("KTBS") hosted several all-day negotiating sessions at its offices in Los Angeles.  First, on March 8, 2018, KTBS hosted a full-day meeting attended by counsel for the Debtors and the Committees.  Then, during the week of March 19, 2018, KTBS hosted three all-day meetings attended by the parties and their professionals.  At these meetings, the parties engaged in extensive debate and discussion regarding, among other things, key legal issues in the Chapter 11 Cases.  Certain of the parties circulated detailed "position papers" regarding such topics in advance of the meetings.

8.      The negotiations were ultimately fruitful, as they culminated with the signing of a *Summary Plan Term Sheet*, dated as of March 22, 2018 [Docket No. 828] (the "Plan Term

Sheet"). The Plan Term Sheet memorialized an agreement in principle by and among the Debtors, the Unsecured Creditors' Committee, the Noteholder Committee, and the Unitholder Committee regarding the fundamental terms of a chapter 11 plan, while providing a basis for further discussion regarding the specific details of the plan and related transactions, which details remained subject to further review, comment, and final approval by the parties.

9.  Following execution of the Plan Term Sheet, the parties continued to extensively negotiate the details of the potential plan. After many weeks of further discussion and negotiations with the Committees, the Debtors finalized and filed the Plan, which substantially incorporates and expands upon the Plan Term Sheet. On July 9, 2018, the Debtors filed the initial versions of the Plan [Docket No. 2138] and Disclosure Statement [Docket No. 2139]. On September 24, 2018, the Debtors filed the Plan Supplement [Docket No. 2657].

10. Based on my own interactions with parties in interest in these Chapter 11 Cases, I believe that the Plan has been proposed following extensive, arm's-length negotiations and discussions with and among key constituencies in these Chapter 11 Cases, including the negotiations described above. I also believe that the Plan has been proposed in good faith with the legitimate and honest purpose of maximizing the ultimate recoveries for all of the Debtors' creditor constituencies and efficiently resolving the Debtors' Estates.

### III. THE PLAN AND PLAN SETTLEMENTS

**A.  Partial Substantive Consolidation**

11. The Plan proposes to substantively consolidate (i) the Fund Debtors into Woodbridge Mortgage Investment Fund 1, LLC, and (ii) the Other Debtors into Woodbridge Group of Companies, LLC ("WGC"). In addition, the Plan Settlements Motion seeks, to the extent necessary or appropriate, substantive consolidation of the Other Debtors into WGC independent of the Plan.

4

12.     First, based on the balloting results, I understand that each class of Creditors that will be affected by the proposed consolidation has voted to accept the Plan, which makes such consolidation consensual.

13.     Second, the affairs of the Other Debtors were hopelessly commingled as part of the overall scheme Robert Shapiro ("Shapiro") implemented.  Once individual investor funds had been obtained by the Fund Debtors, those funds were almost always transferred and commingled into one central bank account at WGC (and before 2016, at Woodbridge Structured Funding ("WSF")).  Thus, with respect to PropCo and MezzCo loans, even though the underlying loan documents facially referenced a loan by a specific prepetition Fund Debtor to the applicable Other Debtor (as defined in the Plan Settlements Motion), in reality, the funds typically originated from a commingled account and generally cannot be traced to any particular prepetition Debtor.  In almost every single case, WGC (or, before 2016, WSF) – rather than any prepetition Fund Debtor or Other Debtor – was the only source of funds used to purchase or develop a property.  Moreover, the amount of money that an Other Debtor promised to repay a particular Fund cannot be correlated with the amount an Other Debtor received from that Fund or what the PropCo paid to purchase or develop a property.  Indeed, in several circumstances, investors hold documents evidencing a note and deed of trust from a PropCo that never even acquired the underlying property.

14.     The Debtors' funds were also used for various other purposes, often without detailed records or accounting and some clearly improper.  For example, Shapiro used these funds to pay for (i) general corporate overhead, (ii) broker commissions of approximately $80 million, (iii) payment of purported returns to old investors (as part of perpetuation of a Ponzi scheme, as discussed further below) of approximately $425 million, and (iv) at least $30 million

for the benefit of Shapiro and his wife, as well as their related entities (including (a) approximately $3.1 million for chartering private planes, (b) approximately $2.2 million for other travel expenses, (c) approximately $2.6 million on home improvements and expenses, (d) approximately $1.8 million for personal tax obligations, (e) approximately $1.4 million to Shapiro's ex-wife, (f) approximately $800,000 on political contributions, (g) approximately $600,000 on vehicle purchases and leases, (h) approximately $330,000 on country club fees, (i) over $6 million on other personal purchases and expenses, and (j) at least $10 million of payments to Shapiro's wife and related entities). In many instances, the transfers made by WGC (or WSF) to or for the benefit of one or more of the Other Debtors were funneled through attorney trust accounts or directly to escrow companies without any clear indication why the transfers were being made or complete records of where the money ultimately went after it was initially transferred to the trust accounts or escrow companies. Shapiro further used the commingled funds to pay for improvements, maintenance, operating expenses, or other expenses for individual properties.

15. Professionals at DSI working under my supervision have examined what are literally tens of thousands of transactions made between or among WGC (or WSF) and the Other Debtors, or by WGC (or WSF) or another Other Debtor on behalf of a different Other Debtor – including based on QuickBooks entries, bank records, and discussions with Woodridge employees. Based on that review, I have determined that it would be exceptionally difficult, if not literally impossible, to trace, reconcile, and reconstruct a reliable and complete allocation of assets and liabilities across WGC (or WSF) and the Other Debtors. This conclusion comports with that reached by a separate forensic accounting investigation conducted on behalf of the SEC by Soneet R. Kapila of KapilaMukamal, LLP, as set forth in a declaration dated December 18,

2017, and filed in the SEC's enforcement action, Case No. 1:17-cv-24624-MGC, ECF No. 36-2 (S.D. Fla. Dec. 26, 2017), which I have reviewed and am familiar with (and which is attached hereto as **Exhibit A**).

16.   The simple fact of the matter is that, from an accounting point of view, WGC (or WSF) and the Other Debtors were not treated as legitimate separate entities. Instead, Shapiro effectively used WGC (or WSF) as an aggregated and wide-open "piggy bank" and spent money from a commingled account as and when he saw fit. The result is a tangled web of commingled and intermingled affairs, which would require consuming massive resources simply trying to untangle (without any guarantee that result could even be achieved at all).

17.   In addition to the lack of accounting formalities, there also is little documentation regarding transactions among and between WGC (or WSF) and the Other Debtors. For example, funds advanced by WGC (or WSF) for the benefit of the Other Debtors were not regularly documented (or even documented at all) as intercompany loan transactions, equity infusions, or some other specified relationship. Rather, consistent with Shapiro's treatment of the commingled account and Other Debtors as an undifferentiated mass freely available to him, many funds flowed on an undocumented basis, which means the Debtors' books and records simply do not contain materials that could in theory allow for a robust reconstruction of how assets and liabilities should be allocated based on formal agreements. Even if such a hypothetical allocation could somehow be constructed, it would have to rest on assumptions and allocation percentages regarding how to apportion operational costs and relative historic liabilities for various expenses and expenditures, as well as potential litigation claims against third parties and other intangible assets, among and between hundreds of different entities. Some assumptions and allocations would likely have the effect of benefiting certain creditors at the

expense of other creditors, and any effort to analyze and fix each separate entity's "fair share" would be a difficult, guess-work process that would likely be subject to significant challenge and ultimately result in costs that would decrease creditor recoveries across the board.

18. Based on the above factors, it is not surprising that the three Committees – each with the benefit of its own retained professionals – have concluded that substantive consolidation of the Other Debtors into WGC is appropriate.

19. It is also my understanding that the Plan makes clear that the proposed substantive consolidation into WGC will not affect the rights of the few creditors that may have valid, perfected security interests in specific real property owned by the Other Debtors as a result of directed interactions involving only such specific property, including, for example, mechanics' lien holders, and tax lien holders. As such, substantive consolidation will give effect to any reasonable expectations of any secured creditors who had created a specific and enforceable relationship with a specific property, is not prejudicial to such creditors, and is otherwise fair under the circumstances.

**B.      Ponzi Scheme Finding**

20. Section 3.11.2(f) of the Plan provides that the Debtors will seek a finding in the Confirmation Order regarding how Shapiro used the Debtors to conduct a Ponzi scheme. Based on the investigation and analysis conducted by the SEC and separately by me and others at DSI under my supervision, it is my conclusion that Shapiro conducted a significant Ponzi scheme through the Debtors.

21. Under Shapiro's control and during the period from August 2012 through December 1, 2017, the prepetition Debtors raised more than $1.29 billion from over 10,000 unsuspecting investors nationwide by selling those investors two primary products, five-year Units and twelve to eighteen month Notes. The Unit transactions provided for a five-year term

with a 6% to 10% aggregate annual return paid monthly and a 2% "accrued preferred dividend." The Note transactions promised Noteholders 5% to 8% annual interest paid monthly with a return of their principal at the end of their Note's term.

22.  Repayment of both Units and Notes, the prepetition Debtors claimed, would be based on the purported revenues the prepetition Debtors purportedly would receive from issuing short-term loans to unrelated third-party property owners. As marketed by the prepetition Debtors, the Debtors would make short-term loans, between $1 million and $100 million, to bona-fide third-party commercial property borrowers at high rates of interest, approximately 11%-15%, secured by a first-position mortgage on the property. These loans to third-parties would supposedly be provided at loan-to-value ratios of approximately 60%-70%. The result, according to the sales pitch, would be a robust and safe cash-flow stream that would provide revenues for the Fund Debtors to repay the Units and the Notes without issue.

23.  In reality, there was no robust and safe cash flow stream from third party borrowers, as a very small fraction of investor money flowed from the prepetition Fund Debtors to unrelated third parties. Rather, Shapiro created disguised affiliates (the PropCos and MezzCos (each as defined in the Plan Settlements Motion)) to which money was loaned. These "borrowers" did not even have bank accounts and clearly they had no ability to service the required interest payments on an ongoing basis. In addition, they had no ability to retire the debt when due, other than through the sale of the underlying property, which doesn't appear to have been contemplated and certainly wasn't effectuated (as described below).

24.  With regard to sales of real property, the annual cash flow from such sales (which sales were not frequent) was well below the amount of principal and interest paid by Shapiro to investors. In 2013, no properties were sold and approximately $3.4 million was paid to investors

in principal and interest. In 2014, no properties were sold and approximately $17.6 million was paid to investors in principal and interest. In 2015, 10 properties with approximate net proceeds of $18.5 million were sold and approximately $84.1 million was paid to investors in principal and interest. In 2016, 15 properties with approximate net proceeds of $28.4 million were sold and approximately $138.2 million was paid to investors in principal and interest. In 2017, 16 properties with approximate net proceeds of $71.4 million were sold and approximately $181.8 million was paid to investors in principal and interest. Clearly, Shapiro knew that he could not make payment of interest and principal only through sales of properties—the above numbers evidence that there were, in fact, grossly insufficient proceeds to permit such payments of principal and interest, and there was no other material source of revenue to pay interest and principal other than from the sale of additional Notes and Units.

25.    Accordingly, instead of being repaid with legitimate business proceeds, the prepetition Debtors used funds received primarily from new investors to make payments to old investors. In the absence of sufficient cash inflows from sources other than investors, Shapiro and the prepetition Debtors, which he controlled, paid approximately $425 million of "interest" and "principal" to existing investors, primarily from funds received from new investors. As previously discussed, Shapiro also used commingled investor money to pay approximately $80 million in commissions, primarily to sales agents who sold these fraudulent "investments" and used investor money to pay at least $30 million for the benefit of Shapiro and his wife, as well as their related entities (including, for example, purchasing luxury items, travel, wine, and the like). While funds from the commingled account were used to purchase the Debtors' real properties, these purchases were directly contrary to material representations made to investors.

26.     Moreover, investments were solicited, and payments of "interest" were made to existing investors, without regard to whether such investors' investment realized value (or even existed). For example, on certain occasions, Shapiro issued Notes in respect of properties that the Debtors never actually acquired, including properties at 778 Sarbonne Road in Los Angeles and 53 Huron Street in Brooklyn. Nevertheless, investments were solicited from investors, and liens and security interests were purportedly granted to the Fund Debtors, to secure "loans" relating to such properties. Another example concerns the property at 800 Stradella Road in Los Angeles, where Shapiro issued about $24.7 million in "first-lien" Notes for the stated purpose of funding a $26 million Fund Debtor-to-PropCo loan that was never made (the PropCo instead took a $26 million loan from the third-party seller of the property at the time of acquisition). And much like the famous play "The Producers," the Debtors purchased the "Owlwood Estate" in September 2016 for $90 million, but signed notes to the Fund Debtors for alleged borrowings in the aggregate amount of $112 million—well above the purchase price of the property.

27.     In late 2017, Shapiro's fraudulent scheme unraveled. As federal and state investigations intensified and unfavorable press reports began to emerge, the prepetition Debtors found it increasingly difficult to raise new capital from investors. As noted above, the prepetition Debtors were reliant on funds from new investors to make the payments promised to existing Unitholders and Noteholders. When new investment dried up, the inability to make required Notes and Units servicing payments became inevitable; indeed, the prepetition Debtors were unable to make the December 1, 2017 interest and principal payments due on the Notes, which quickly precipitated the filing of the initial Debtors' bankruptcy cases.

28.     On December 20, 2017, the SEC filed a complaint (the "SEC Complaint") against, among other parties, Shapiro and many of the Debtors in the U.S. District Court for the

Southern District of Florida as Case No. 1:17-cv-24624-MGC (the "SEC Action"), which I have reviewed. The SEC Complaint alleged repeatedly and expressly that Shapiro had used the Debtors to conduct a massive Ponzi scheme. On December 21, 2017, the District Court in the SEC Action entered an order unsealing the SEC Complaint and allowing the docket of the SEC Action to be accessible to the public.

**C.     Nature of Claims Asserted by Noteholders and Unitholders**

29.     The Debtors have determined that no Noteholder is in physical possession of any Purported Noteholder Collateral, and that no UCC-1 financing statement was filed in Delaware on behalf of any Noteholder with respect to any of the Purported Noteholder Collateral. Attached hereto as **Exhibit B** is a representative Note issued by the Debtors to a Noteholder.

30.     Facts potentially supporting the determination that the Unitholders hold "claims" against, or "debt" of, the Fund Debtors include, without limitation, (i) Unitholders received monthly interest checks, not dividends, and received from the Debtors 1099-INT tax forms characterizing these payments as interest income for each annual period prepetition; and (ii) the Units were recorded on the Debtors' books and records as a liability and treated as a liability in the Debtors' tax returns.

31.     Facts potentially supporting the determination that the Unitholders do not hold "claims" against, or "debt" of, the Fund Debtors include, without limitation, (i) the Units have some characteristics of preferred equity, including the prospect of incentive compensation and profit sharing from the Debtors' various real estate investments, which creates equity-like "upside" potential; (ii) the offering memoranda regarding the Units indicates that the Debtors would distribute, at least annually, returns of 6% to 10% per annum to Unitholders on account of any capital invested, but only to the extent of available funds *after* creditor claims are adequately provided for; and (iii) other nomenclature used in the offering materials connotes that the Units

were conceptualized as "equity" or "capital" investments.  Attached hereto as **Exhibit C** is a representative offering memorandum for the sale of Units.  Attached hereto as **Exhibit D** is a representative Unit issued by the Debtors to a Unitholder.

### D. Other Confirmation Requirements

32. <u>Compromises and Settlements</u>.  It is my belief that the settlements and compromises incorporated in the Plan are appropriate under the circumstances.  Among other things, as noted above, the terms of those settlements and compromises were negotiated extensively over a period of many months by and among the Debtors and the Unsecured Creditors' Committee, the Noteholder Committee, and the Unitholder Committee, which represent the key creditor constituencies in these Chapter 11 Cases.  The settlements and compromises are a cornerstone of the Plan, which was designed and is intended to be a vehicle to resolve many thorny issues that otherwise could take years to resolve with finality.  In my business judgment, it is manifestly in the best interests of all Creditors to obtain these resolutions and attendant certainty and to avoid the years of litigation and associated expense, delay, and uncertainty associated therewith.

33. <u>Releases, Exculpations, and Limitations of Liability</u>.  Article XI of the Plan includes certain release, exculpation, and limitation of liability provisions.  I am not aware of any viable Causes of Action against the Released Parties.  Moreover, I believe that the Released Parties have provided many valuable contributions to the progress of the Chapter 11 Cases, including stewarding the Debtors through the bankruptcy process, negotiating and implementing settlements with various parties, pursuing Confirmation of the Plan, and otherwise preserving Estate Assets for the benefit of all stakeholders.  In light of these different contributions, I believe the releases and exculpations included as part of the overall compromise and settlement embodied by the Plan are fair, equitable, and reasonable.

34. <u>Liquidation Under Chapter 7</u>.  The Plan is a plan of liquidation.  The costs of liquidation under chapter 7 of the Bankruptcy Code would include the fees payable to a chapter 7 trustee, and the fees that would be payable to additional attorneys and other professionals that such a trustee may engage.

35. Significantly, the benefits of the Plan Term Sheet, the terms of which are substantially incorporated into the Plan, are available only under the Plan.  The Plan embodies a comprehensive, extensively negotiated settlement and compromise of myriad novel and complex legal and factual issues, including, among other things, (i) whether the Notes are unsecured claims or are indirectly secured by valid, perfected security interests in property of the Estates, (ii) whether the Units are debt or equity interests, (iii) whether any of the Debtors have valid or enforceable Intercompany Claims or Intercompany Liens against Estate Assets owned by other Debtors, and (iv) whether substantive consolidation of the Debtors' Estates is warranted under the circumstances.  In the event of conversion, the chapter 7 trustee, Noteholders, Unitholders, and Holders of General Unsecured Claims would have to confront the pursuit of extensive litigation to resolve all of these and other issues, or would need to try to negotiate an alternative settlement. Even if it led to the same ultimate result, this process would be extremely time-consuming and costly, and would reduce and delay any recoveries available for Creditors of the Estates.

36. In addition, a chapter 7 trustee might decide instead to conduct an immediate sale of the Wind-Down Assets, including because (i) a chapter 7 trustee probably might not have adequate staffing or funding to dispose of the Debtors' real property over an extended period of time, and (ii) a chapter 7 trustee would need to seek authorization to operate the Debtors' remaining business.  In light of, among other things, the limited universe of potential buyers for

luxury high-end residential properties, such a forced sale by a chapter 7 trustee would likely ultimately result in significantly lower recoveries from the sale of the Wind-Down Assets, as set forth in the liquidation analysis attached as Exhibit B to the Disclosure Statement (the "Liquidation Analysis").

37. I and other professionals at DSI prepared the Liquidation Analysis. I believe that the Liquidation Analysis reflects the Debtors' best estimate of projected recoveries under the scenarios set forth therein based on currently available information. I further believe that the analysis and such assumptions were prepared in good faith with regard to a hypothetical chapter 7 liquidation of the Debtors. Among other things, the Liquidation Analysis shows that even in the "High Case" scenario analysis for the Holders of Standard Note Claims and Unit Claims, as applicable (which analysis makes the most favorable possible assumptions regarding the outcome that could be obtained by the subject constituency through litigation), the estimated recovery on such Claims is greater under the Plan than in a chapter 7 liquidation scenario. Nothing has come to my attention that would lead me to believe the Liquidation Analysis should be revised based on information I have learned since the approval of the Disclosure Statement.

38. Conversion to chapter 7 of the Bankruptcy Code would also mean the establishment of a new claims bar date, which would result in new General Unsecured Claims, Note Claims, or Unit Claims being asserted against the Estates, thereby potentially diluting the recoveries of other Holders of Allowed Claims. Conversion to chapter 7 could also create various asset and liability allocation and intercompany reconciliation issues, which would ultimately adversely affect the net proceeds available for distribution to creditors in those converted cases.

39. On balance, I believe that a chapter 7 trustee would be less likely to maximize the value available from all the Estate Assets and would be unable to obtain many or perhaps even any of the benefits of the compromises and settlements available under the Plan. Therefore, I have concluded that confirmation of the Plan will provide each Holder of a General Unsecured Claim, Note Claim, or Unit Claim with an equal or greater recovery than such Holder would receive pursuant to the liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

40. <u>Plan Feasibility</u>. The Plan specifically proposes a liquidation and eventual dissolution of each of the Debtors. I believe the Debtors' current Cash and additional proceeds to be generated from the Wind-Down Assets and the Liquidation Trust Assets will be sufficient to allow the Liquidation Trust to make all payments the Liquidation Trust is required to make under the Plan, including (i) paying in full all Allowed Administrative Claims, DIP Claims, Professional Fee Claims, Priority Tax Claims, and Priority Claims as required by the Plan; and (ii) allowing for periodic payments to holders of Allowed Class 3, Class 4, and Class 5 Claims (none of which are guaranteed a particular recovery under the Plan, including due to the risk factors detailed in the Disclosure Statement) consistent with the Plan.

41. <u>No Gerrymandering</u>. I believe Claims and Equity Interests have been separately classified under the Plan based on differences in the economic nature, legal rights, or priority of such Claims and Equity Interests. I do not believe Claims and Equity Interests under the Plan were separately classified with the intent to create an impaired accepting class.

42. <u>Executory Contracts</u>. I believe that the executory contracts and unexpired leases (i) that the Debtors have chosen to assume and assign to the Wind-Down Entity are those that may be necessary for the Wind-Down Entity to carry out its duties under the Plan and effectuate the orderly wind down of the Wind-Down Assets, and (ii) that the Debtors have chosen to reject

are no longer necessary for those purposes and would otherwise be a net burden on the Estates. Accordingly, I believe the Debtors have exercised sound business judgment in identifying the executory contracts and unexpired leases to be assumed and assigned, or to be rejected, pursuant to the Plan.

43. <u>Inapplicability of Certain Bankruptcy Code Provisions</u>.  The Debtors (a) do not provide retiree benefits; (b) are not required by any judicial or administrative order, or by statute, to pay any domestic support obligation; (c) are not individuals; and (d) are not nonprofit corporations.

44. <u>Bankruptcy Code Section 1129(d)</u>.  I do not believe that the principal purpose of the Plan is avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933.

## IV.  CONCLUSION

45. I believe that the Plan will achieve a successful liquidation of the Debtors.  I believe that the Plan provides significant and perhaps otherwise unattainable benefits to the Debtors and all their various stakeholders and provides the best opportunity for creditors to maximize recoveries under the circumstances.  As such, I believe the Bankruptcy Court should confirm the Plan and grant the Plan Settlements Motion.

Executed this 19th day of October, 2018, at New York, New York.

*/s/ Bradley D. Sharp*
Bradley D. Sharp